# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| KRISTI STEPHENS, | Case No.: 1:10-cv-00267-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | **PLAINTIFF'S MOTION TO AMEND COMPLAINT** (Docket No. 29) |
| IDAHO DEPARTMENT OF PARKS AND RECREATION and JOHN DOES 1-10, | |
| Defendants. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** (Docket No. 32) |

Currently pending before the Court are (1) Plaintiff's Motion to Amend Complaint (Docket No. 29), and (2) Defendant's Motion for Summary Judgment (Docket No. 32). Having carefully reviewed the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. BACKGROUND

Kristi Stephens ("Plaintiff") began her career with the Idaho Department of Parks and Recreation ("Defendant," "IDPR," or "Department") as a seasonal worker in 1986 and, in 1989, became a park ranger. *See* Pl.'s Compl., ¶ 19 (Docket No. 1). In the Spring of 2004, Plaintiff applied for the vacant park manager position at Dworshak State Park near Orofino, Idaho. *See id.* at ¶ 21. On July 18, 2004, Plaintiff was appointed as "Park Manager 3" at Dworshak State Park. *See id.* at ¶¶ 14 & 22. At the time of her promotion, Plaintiff was the first and only female to ever be promoted above the position of "Park Manager 1"; Plaintiff was also the first person

**MEMORANDUM DECISION AND ORDER - 1**

to make the three-step vertical move up from "Ranger" to "Park Manager 3."  *See id.* at ¶ 22.

Plaintiff was fired on December 16, 2008.  *See id.* at ¶ 46.  Plaintiff alleges she was wrongfully

terminated and, in her original Complaint, asserted three claims for relief:  (1) gender

discrimination, (2) hostile work environment, and (3) negligent infliction of emotional distress.

*See id.* at ¶¶ 51-58.

Plaintiff seeks to amend her Complaint to add three additional claims: (1) violation of

civil rights pursuant to 42 U.S.C. § 1983 (denial of 14th Amendment procedural due process

rights); (2) violation of civil rights pursuant to 42 U.S.C. § 1983 (denial of 14th Amendment

substantive due process rights); and (3) breach of implied covenant of good faith and fair

dealing.  *See* Pl.'s Proposed First Am. Compl., ¶¶ 72-84 (Docket No. 29, Att. 2).  Defendant

opposes these efforts while also moving for summary judgment on Plaintiff's gender

discrimination, hostile work environment, and negligent infliction of emotional distress claims.

*See* Def.'s Mot. for Summ. J. (Docket No. 32).

## II.  <u>STANDARDS OF LAW</u>

### A.    **Motion to Amend**

Although Rule 15 generally provides a liberally allowed avenue for amending pleadings,

once a scheduling order has been entered pursuant to Rule 16(b), an additional showing of

"good cause" for amendment must be made if the scheduling order deadline for amendment has

passed.  *See Johnson v. Mammoth Recreation, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992) ("A party

seeking to amend a pleading after the date specified in the scheduling order must first show good

cause for amendment under Rule 16, then if good cause be shown, the party must demonstrate

that amendment was proper under Rule 15.").  The "good cause" standard under Rule 16 focuses

**MEMORANDUM DECISION AND ORDER - 2**

primarily on the "diligence of the party seeking the amendment." *See id*. at 609.  "If the party seeking the modification was not diligent, the inquiry should end and the motion to modify should not be granted." *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (citation and internal quotation marks omitted).

**B.      Motion for Summary Judgment**

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To carry this burden, the moving party need not introduce affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id*. at 256-57.  The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.  Only admissible

**MEMORANDUM DECISION AND ORDER - 3**

evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(e).

## III. DISCUSSION

**A.     Plaintiff's Motion to Amend Complaint (Docket No. 29)**

Plaintiff argues that, through discovery – in particular, the April 2011 depositions of Betsy Johnson, Dean Sangrey, and David White – she "discovered additional facts, which[,] when considered in conjunction with the original allegations in the May 27, 2010 complaint, and when considered in their own light, warrant the amending of the original complaint." *See* Pl.'s Mem. in Supp. of Mot. to Am., p. 2 (Docket No. 29, Att. 1). Consistent with FRCP 15(a)(2), Plaintiff "requests the Court's approval to file the amended complaint because justice so requires." *See id.* at p. 4. However, Plaintiff's amendment efforts take place nearly six months after the December 17, 2010 amendment deadline set forth in the Court's September 2, 2010 Case Management Order. *See* 9/2/10 CMO (Docket No. 15).[1] Therefore, to amend her pleadings, Plaintiff must actually satisfy the more heightened "good cause" standard under FRCP 16(b)(4). *See supra* at pp. 2-3 (citing Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.")).

Plaintiff maintains that, through the above-referenced depositions, she "discovered that she was not afforded procedural rights during her termination and that her termination violated the implied covenant of good faith and fair dealing." *See* Pl.'s Mem. in Supp. of Mot. to Am., p. 2 (Docket No. 29, Att. 1). Independent of whether Plaintiff should have already been aware of

---

[1]  The deadlines outlined within the September 2, 2010 Case Management Order were taken largely from the parties' August 30, 2010 Stipulated Litigation Plan. *See* Stip. Lit. Plan (Docket No. 14). With the Stipulated Litigation Plan, the parties agreed to the December 17, 2010 amendment deadline. *See id.* at p. 1.

**MEMORANDUM DECISION AND ORDER - 4**

Defendant's internal protocol for dismissing an employee (through either her 22-year employ

with the IDPR or as a result of her participation with the administrative process following her

termination) and whether those procedures were in fact followed here, Plaintiff offers no reason

why such information could not have otherwise been discovered *before* the December 17, 2010

amendment deadline – particularly when considering that Plaintiff first initiated this action on

May 27, 2010.  So, while it may be argued that Plaintiff only became aware of additional causes

of action following these depositions, the record contains no justification for her failure to

uncover these alleged circumstances before December 17, 2010 – through either earlier written

discovery or earlier depositions.  This lack of diligence augurs against any finding of good cause.

Plaintiff argues, however, that the delay in taking the referenced depositions is not what it

may appear.  She contends that an agreement between counsel made in January 2011 called for

the depositions to be taken in late February/early March 2011, but at the request of Defendant's

counsel, and due to Defendant's counsel's trial schedule, the depositions had to be moved to late

April 2011.  *See* Pl.'s Reply in Supp. of Mot. to Am., p. 2 (Docket No. 31).  Even if true, these

scheduling changes cannot constitute good cause given that the December 17, 2010 amendment

deadline had already come and gone before the parties even agreed to the referenced deposition

dates in January 2011,[2] let alone the actual April 2011 depositions themselves.  The relevant time

period was that period between the time the scheduling order was entered, and the deadline in

December for amendment of pleadings.

---

[2]  During oral argument, Plaintiff's counsel stated that, had the depositions gone forward
when originally scheduled (late February/early March 2011), he would have moved to amend
immediately thereafter.  This argument fails to acknowledge the preceding December 17, 2010
amendment deadline – indeed, during oral argument, Plaintiff's counsel incorrectly stated that
the amendment deadline was "around March 2011" and "certainly" after the originally-scheduled
deposition dates.

**MEMORANDUM DECISION AND ORDER - 5**

The Court accepts Plaintiff's arguments that facts emerged during depositions that could support previously-unasserted causes of action. Still, such a circumstance cannot overcome that party's lack of diligence in actually (and timely) uncovering those same facts. Even though such a result may seem harsh, the need for orderly and timely progression of the lawsuit is necessary and important. Pleadings cannot be a continuously moving target for obvious reasons. The amendment deadline serves to frame the issues at a fixed point in time so that the parties have an adequate opportunity to prepare their respective positions moving forward. Even so, the deadline will not entirely foreclose amendments, so long as the standard of good cause is met to warrant the amendment. Here, the proffered reasons for the proposed untimely amendment do not constitute good cause, particularly where a primary element of good cause is due diligence. Accordingly, Plaintiff's Motion to Amend Complaint (Docket No. 29) is denied.

**B.      Defendant's Motion for Summary Judgment (Docket No. 32)**

The Court next considers Defendant's motion for summary judgment on each of Plaintiff's three remaining causes of action: (1) gender discrimination, (2) hostile work environment, and (3) negligent infliction of emotional distress.

1.      <u>Plaintiff's Gender Discrimination Claim</u>

Plaintiff argues that Defendant terminated her because she is female. Under Title VII, an employer may not discriminate against an individual with respect to her privileges of employment because of her gender. *See* 42 U.S.C. § 2000e-2(a). Any such "disparate treatment" is a violation of federal law, unless a defense also recognized by law would insulate such action

Under the familiar burden-shifting scheme set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff alleging disparate treatment under Title VII must first establish a

**MEMORANDUM DECISION AND ORDER - 6**

prima facie case of discrimination by offering evidence that "give[s] rise to an inference of unlawful discrimination." *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  A prima facie case may be established either by (1) providing direct evidence suggesting that the employment decision was terminated based on an impermissible criterion, or (2) the four-part test laid out in *McDonnell Douglas*.[3]  *See id.*

Once a prima facie case has been made, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 115, 1123-24 (9th Cir. 2000).

If the employer provides such a reason, the plaintiff must then show that the articulated reason is pretextual "either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer[,] or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs. V. Burdine*, 450 U.S. 248, 256 (1981).  When the evidence is direct, "'[w]e require very little evidence to survive summary judgment' in a discrimination case." *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994) (quoting *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991)). "But when the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat the employer's motion for summary judgment." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005).

---

[3] To establish a prima facie case of gender discrimination under the *McDonnell Douglas* framework, a plaintiff must show that (1) she belongs to a protected class, (2) she was qualified for the position, (3) she was subjected to an adverse employment action, and (4) similarly situated men were treated more favorably. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).

**MEMORANDUM DECISION AND ORDER - 7**

### a.    Plaintiff's Burden: Establishing a Prima Facie Case

Defendant obliquely argues in a footnote that Plaintiff is incapable of establishing the prima facie elements of her disparate treatment claim, stating only that, "given her significant performance deficiencies in the core administrative duties as a Park Manager, there is no evidence that she was fully qualified for the position."  *See* Def.'s Mem. in Supp. of Mot. for Summ. J., p. 3 n.2 (Docket No. 32, Att. 2).  The Court disagrees.

As to the discrete issue of Plaintiff's ability to establish a prima facie case of disparate treatment, Defendant merely disputes Plaintiff's qualifications.  On this point, it must be recognized that Plaintiff's supervisor, David White ("Supervisor White"), testified that Plaintiff was, in fact, qualified to be a Park Manager.  *See* White Depo. at 78:22-79:14 (Docket No. 36, Att. 5).  Additionally, Plaintiff had been with the IDPR for 22 years, including over four years as a Park Manager, prior to her termination.  When construing all disputed facts in Plaintiff's favor, Plaintiff was qualified to be a Park Manager.

It is undisputed that Plaintiff is a woman.  It is also undisputed that Plaintiff was subjected to an adverse employment action by virtue of her termination.  To the extent she was fired while other similarly-situated male Park Managers were not fired (Defendant does not dispute this alleged detail), it would appear that such men were treated more favorably.  These factors, along with Plaintiff's qualifications to be a Park Manager, combine to establish a prima facie case for disparate treatment.  Plaintiff's arguments in this respect are therefore persuasive. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 3 (Docket No. 36).

### b.    Defendant's Burden: Legitimate, Non-Discriminatory Reason for Plaintiff's Termination

The thrust of Defendant's challenge to Plaintiff's gender discrimination claim is that the IDPR had "legitimate, non-discriminatory reasons for dismissing [Plaintiff] after more than two

**MEMORANDUM DECISION AND ORDER - 8**

years of poor performance."  *See* Def.'s Mem. in Supp. of Mot. for Summ. J., p. 3 (Docket No.

32, Att. 2).  According to Defendants, Plaintiff's poor performance can be summarized as: (1)

Plaintiff's failure to follow Department fiscal and revenue policies, (2) Plaintiff's failure to

follow directives related to employee overtime, (3) Plaintiff's lack of organization, (4) Plaintiff's

inability to adequately communicate with IDPR management and fiscal staff, and (5) Plaintiff's

failure to successfully discharge the core responsibilities of her position.  *See id.* at p. 4.

> **i.      Alleged Failure to Follow Department Fiscal and Revenue Policies**

Defendants argue that, as Park Manager, Plaintiff was repeatedly told to follow internal

fiscal policies, to no avail.  *See id.*  For example, Supervisor White generally testifies:

> On July 22, 2005, I began receiving information from the IDPR fiscal offices in
> Boise that Dworshak Park was not completing reports and purchase transmittals as
> required, nor was Ms. Stephens responding to staff requests to complete these
> processes.  I called Ms. Stephens to discuss an inventory report that the fiscal office
> was trying to get her to complete and forward on for processing.  She told me she
> had sent the report to Boise but it must have been lost and she had followed up with
> a call to the fiscal offices, but was unable to reach the person who had sent her the
> notice and was requesting the report.  She also indicated she had not kept a copy of
> her report for her records.  This type of response was typical during Ms. Stephens'
> tenure as Park Manager.  She frequently did not return phone calls or e-mails or keep
> me or other apprised of what steps she had taken to resolve problems after she was
> contacted by Department staff.  This would necessitate that I or someone else follow-
> up with her to find out the status of the matter.  She would usually tell me she had
> taken care of the problem – even if she had not – or that the document was either in
> the mail or the IDPR staff person had "lost" her documentation.  Typically, I would
> explain to her that it was important that she respond to e-mails and phone calls
> immediately and let people know what she was doing to address problems and that
> when she did not respond, people assumed she was ignoring the problem.  This
> continued to be a pattern and was ultimately one of the performance deficiencies that
> led to the decision to dismiss her.

*See* White Aff. at ¶ 13 (Docket No. 32, Att. 8).

Relatedly, on her 2007 Performance Evaluation Form (completed in April 2008), Plaintiff

received an overall "Does Not Achieve Performance Standards" rating.  *See* Ex. 23 to White Aff.

**MEMORANDUM DECISION AND ORDER - 9**

at ¶ 63 (Docket No. 32, Att. 10).  Within that evaluation form, Plaintiff was critiqued on various

management standards.  With respect to "Communication," the evaluation form indicates a

"Does Not Achieve Performance Standards" and reads in relevant part:

- You have not done a very good job of responding to requests by myself or Boise HQ which is evidenced in the many emails and phone calls that were not responded to; some of which resulted in fiscal issues prolonging beyond an acceptable amount of time.

- These issues ("Ensure that all administrative duties from providing input to processing purchases to reviewing emails are completed in the time required assessing overall organization and process followed at the park.") were identified in your 2007 Work Plan as a goal.  Each time I confronted you about this, you made excuses and indicated that it would improve.  Unfortunately, it has not.  You have to make improvements in this area so that internal issues both with local staff and the region/Boise are addressed in a timely manner.

*See id*.  With respect to "Decision Making/Problem Solving," the evaluation form indicates a

"Does Not Achieve Performance Standards" and similarly reads in relevant part:

- [Y]ou have not assessed and resolved the problems that have persisted since 2005 associated with prompt and appropriate purchasing processes.  The process had improved for a time based upon 2005 changes.  We have discussed these issues on several occasions and I summarized the problem and requested a plan of action and change in a December 2006 Memo to you.  Unfortunately, issues associated with timeliness and policy adherence have not improved overall.

- In addition to this, you allowed an issue over revenue reconciliation to go unaddressed for several months even though you were contacted by fiscal on several occasions to rectify the problem.

- And lastly, you have not been able to monitor your budget due to not having access to pre-stars so you have not been managing allocations effectively.  The department provided you training both in Boise with fiscal and with region staff on-site but with minimal improvement on your part.  You have not been responsive nor have you been proactive in resolving these various issues.  This is unacceptable of a Park manager of this level and with your experience.

**MEMORANDUM DECISION AND ORDER - 10**

*See id.*  With respect to "Results Focus," the evaluation form indicates a "Does Not Achieve

Performance Standards" and again reads in relevant part:

- [A]s previously indicated, you did not overcome the communication, purchasing, and revenue reconciling obstacles nor have you taken full responsibility for them by making excuses and not making necessary improvements.

- You have not addressed the identified 2006 Evaluation specific performance changes – . . . "Ensure that all purchases and their processing adheres to policy and procedures. . . . ." nor the 2007 Goals – . . . "Ensure that all administrative duties from providing input to processing purchases to reviewing emails are completed in the time required . . . ."

- The department provided you fiscal training both at HQ in Boise and at the park with Region staff but you have not been able to parlay this into the required results.  We have also spoken about these issues on several occasions and were told that improvements needed to occur and you agreed. As previously stated, this was documented to you in a December 2006 memo. Unfortunately, you have not demonstrated the ability to overcome the obstacles precluding you from accomplishing these basic requirements of a Park Manager.

*See id.*[4]

Three months after her 2007 Performance Evaluation, on July 2, 2008, Supervisor White

issued a "Notice of Unacceptable Performance" to Plaintiff, formally notifying her that "[her]

current unacceptable performance in [her] position as a Park Manager 3 will not be allowed to

continue without significant and immediate improvement."  *See* Ex. 29 to White Aff. at ¶ 70

(Docket No. 32, Att. 10).  Therein, Plaintiff was reminded that "[p]rocessing transactions is an

---

[4]  It should be noted that the 2007 Performance Evaluation also contains "Achieves Performance Standards" ratings for the "Managing Performance," "Customer Focus," and "Work Environment/Safety" categories.  *See* Ex. 23 to White Aff. at ¶ 63 (Docket No. 32, Att. 10). Still, with respect to "Customer Focus," the evaluation form states: "However, as previously stated, you have done a poor job of addressing our other customers in our Boise staff and those that we purchase from."  *See id.*

**MEMORANDUM DECISION AND ORDER - 11**

important responsibility," but that, "[u]nfortunately [she] ha[s] struggled with this responsibility in conjunction with other day-to-day duties from the beginning."  *See id.*  Supervisor White then outlined the historical "documentation and efforts" provided thus far to help Plaintiff with identifying these issues and what was needed to correct them, highlighting the following:

- August 1, 2005: I informed you that various routine processes were not being completed accurately or timely; hence, region staff would conduct on-site training and you were to set up a two to three day session with Boise Headquarters' fiscal staff, which was done and documented in your 2005 annual evaluation.  *See id.*; *see also* White Aff. at ¶ 9 (Docket No. 32, Att. 8).

- 2005 Annual Evaluation: I noted that you were struggling with ensuring that day-to-day tasks were completed thoroughly and in a timely manner.  Both fiscal staff from Boise headquarters and Region staff came to the park and provided on-site training for you and staff to ensure that you understood the requirements and the relevant processes.  *See id.*; *see also* Ex. 3 to White Aff. at ¶¶ 10 & 21 (Docket No. 32, Att. 9).

- June 30, 2006: I authorized fiscal to approve and close transactions older than 5-31-06 due to your inability to provide proper documentation.  I assured them that necessary actions were taking place to rectify future problems.  I notified you of my actions as well as my expectations that you would follow-up appropriately.  *See id.*; *see also* Ex. 5 to White Aff. at ¶ 24 (Docket No. 32, Att. 9).

- November 28, 2006: You were notified about outstanding Dworshak Pcard transactions three to five months in arrears.  Of the 33 identified for the Region, 25 or 76% of them were for Dworshak with 11 or 33% of them yours with the oldest being 5+ months.  *See id.*; *see also* White Aff. at ¶ 30 (Docket No. 32, Att. 8).

- December 4, 2006: After discussing your unacceptable administrative performance with you, I followed up with documentation and our agreed-upon course of action for you to review policies and procedures with staff, obtain training for both you and staff, and ensure that all administrative processes are completed accurately and thoroughly on a weekly basis utilizing a processing check list.  *See id.*; *see also* Ex. 8 to White Aff. at ¶ 32 (Docket No. 32, Att. 9).

- 2006 Annual Evaluation: I noted that you had obtained training from staff in Boise as well as from Region in fiscal purchasing procedures.  In addition, you did assess current processes to identify problems which resulted in a

**MEMORANDUM DECISION AND ORDER - 12**

checklist to ensure all staff complete purchases and associated documents by policy and procedure.  However, purchasing procedures were not adhered to most of the year even after the problems were identified and addressed.  *See id.*; *see also* Ex. 10 to White Aff. at ¶ 36 (Docket No. 32, Att. 9).

In the annual staff survey, your staff identified that many of the park's administrative functions are unorganized, which negatively impact the ability to process purchases appropriately.  This unacceptable performance resulted in my documenting these problems as a formal written reprimand to you on 12-4-06 as noted above.  *See id.*; *see also* Ex. 8 to White Aff. at ¶ 32 (Docket No. 32, Att. 9).

• February 14, 2007: You were notified of Dworshak transactions over 30 days old that had not been approved.  Of the 56 identified for the Region, 13 or 23% were Dworshak's and 8 or 14% were yours with the oldest being 2+ months old.  *See id.*; *see also* White Aff. at ¶ 37 (Docket No. 32, Att. 8).

• July 5, 2007: In an email, you were asked to provide additional information for a 2+ month old meal purchase that was originally requested from you on 6-19-08 and followed up with several phone messages that you had not responded to.  *See id.*; *see also* Ex. 15 to White Aff. at ¶ 48 (Docket No. 32, Att. 10).

• November 19, 2007: I emailed you as follow up to an unreturned phone message that I left you 7+ days previously.  I was concerned about numerous lost receipt approval requests, incomplete documents sent to fiscal, and unreconciled revenue from the summer that fiscal and been trying to rectify with you.  I also noted that your current performance was unacceptable and change needed to occur.  *See id.*; *see also* Ex. 16 to White Aff. at ¶ 52 (Docket No. 32, Att. 10).

• December 5, 2007: You were provided a list of Dworshak transactions over 30 days old that had not been approved.  Of the 110 identified for the Region, 69 or 63% were Dworshak's and 38 or 34% were yours with the oldest being 9+ months old.  *See id.*; *see also* Ex. 17 to White Aff. at ¶ 53 (Docket No. 32, Att. 10).

• December 31, 2007: You were notified that as of the end of the 2007 calendar year the park only had 4.5% of its allocation remaining.  To resolve this, you recoded several transactions from the park to the marina.  In general, these changes were somewhat questionable, so you were required to provide justification and ensure that these and future transactions were coded accurately.  *See id.*; *see also* Ex. 18 to White Aff. at ¶ 55 (Docket No. 32, Att. 10).

**MEMORANDUM DECISION AND ORDER - 13**

- 2007 Annual evaluation: you received an overall rating of "Does not Achieve Performance Expectations."  As noted above, you did not complete or perform up to expectations on these administrative functions of your position. You have been unresponsive to requests from me and from Boise HQ staff as evidenced by the many emails and phone calls not answered.  You have not provided accurate, timely, or complete documentation on purchases and other fiscal issues.  During the last two years, each time I discussed this with you, you made excuses and indicated that it would improve.  Unfortunately, it has not.  In addition, I noted in your 2008 work plan that you were to provide a plan of action to me by 4/18/08 outlining how you would address these unresolved issues.  It is now July 2008 and I have not received any plan of action.  *See id.*; *see also* Ex. 23 to White Aff. at ¶ 63 (Docket No. 32, Att. 10).

- May 30, 2008: You were provided a list of transmittals that were outstanding with the oldest being almost three months old and with the end of the fiscal year approaching the need to reconcile them.  There were a total of 18 transactions and all were for purchases you made.  *See id.*; *see also* Ex. 26 to White Aff. at ¶ 67 (Docket No. 32, Att. 10).

- June 19, 2008: You were provided a list of 61 transactions that were outstanding for the part with the oldest being 3+ months old.  Of the total, 20 or 33% were purchases in your name.  As of 6-26-08, fiscal had not received the proper paperwork to reconcile 51 (84%) of the transactions.  *See id.*; *see also* Exs. 27 & 28 to White Aff. at ¶ 68 (Docket No. 32, Att. 10).

Supervisor White then required Plaintiff to (1) develop a "Plan of Action" to address and rectify prompt and appropriate purchasing process, applicable revenue reconciliation, and effective budget monitoring; (2) reconcile all travel expenses within 10 work days of the ending travel date; (3) reconcile all purchases within 30 days of the date of purchase; (4) adhere to all purchasing policies, procedures, rules, and regulations; (5) provide written justification within two days of any required deviation from processing transactions; (6) monitor the various Dworshak budgets weekly to ensure effective and efficient use of funds and that transactions are coded out to the appropriate, applicable project; and (7) respond to all requests within three days. *See id.*  Supervisor White indicated that, if Plaintiff was unable to meet these requirements, she

**MEMORANDUM DECISION AND ORDER - 14**

could face termination. *See id.* ("If you are unable to adhere to all of these directives in conjunction with your other responsibilities, it will be necessary to pursue further action, up to and including termination.").

According to Defendant, these problems continued, with other IDPR staff complaining that expenditures/transmittals were still not being processed correctly. *See* Def.'s Mem. in Supp. of Mot. for Summ. J., p. 5 (Docket No. 32, Att. 2) (citing Exs. 33 & 37 to White Aff. at ¶¶ 78 & 83 (Docket No. 32, Att. 11)). On September 15, 2008, Defendant issued a "Notice of Contemplated Action," informing Plaintiff that she may be dismissed in light of her alleged inability to comply with internal fiscal and revenue policies, while placing her on administrative leave with pay. *See* Ex. 39 to White Aff. at ¶ 85 (Docket No. 32, Att. 11). While on administrative leave, IDPR staff sorted through Plaintiff's office, finding "numerous invoices that were in arrears, P-card purchases that were incomplete and not timely processed, travel vouchers that had not been timely or properly processed, and checks that had not been deposited in Department accounts." *See* Def.'s Mem. in Supp. of Mot. for Summ. J., pp. 5-6 (Docket No. 32, Att. 2) (citing Exs. 41-44 to White Aff. at ¶¶ 88, 90, & 92 (Docket No. 32, Att. 11)).

### ii.      Alleged Failure to Follow Directives Related to Employee Overtime

After learning in July 2005 that Plaintiff and her employees were accruing overtime above policy limits without authorization, Supervisor White counseled Plaintiff on "the need to organize and schedule staff work assignments and projects to effectively manage staff hours and personnel budgets, to minimize the use of employee overtime and reduce additional personnel costs, and to follow Department policies for overtime use and approval." *See id.* at p. 6 (citing White Aff. at ¶¶ 16-18 (Docket No. 32, Att. 8)). In May 2007, Supervisor White again warned

**MEMORANDUM DECISION AND ORDER - 15**

Plaintiff about the need to manage employee overtime.  *See* Ex. 13 to White Aff. at ¶ 45 (Docket

No. 32, Att. 10) ("You and your staff are building up a lot of comp time prior to the busy season.

Hence, you need to managing schedules so that we do not run into any problems.  Thanks.").

According to Defendants, these issues were not resolved as employees continued to exceed

overtime limits without proper authorization.  *See* Def.'s Mem. in Supp. of Mot. for Summ. J., p.

6 (Docket No. 32, Att. 2).

### iii.   Alleged Lack of Organization

Part and parcel with Defendants' claim that Plaintiff lacked the fiscal management skills

to effectively accomplish her duties as Park Manager, Defendants assert that Plaintiff

"continually displayed a lack of organization in discharging her duties as Manager of Dworshak

Park."  *See id.* (citing White Aff. at ¶ 36 (Docket No. 32, Att.8)).  In addition to Supervisor

White's testimony, Chuck Gross (a former Park Ranger hired, trained, and supervised by

Plaintiff at Dworshak State Park) also testified that Plaintiff's organizational skills were lacking:

- One of the primary problems at the Park was that management of park activities seemed chaotic and disorganized at times.  Ms. Stephens had many good ideas for activities at the park and she was very good at working with the public and promoting the Park, however, she was poor at managing some of the details and following through with the time it takes to properly plan and cost out park events.  Often she did not coordinate activities well with her staff.  She seldom gave me feedback about how I was doing and what I needed to do to keep park operations under control.  Her approach to Park activities was to delegate a lot of responsibility to the rangers, which forced us to be reactive more than proactive.  She expected us to be flexible and adaptable to unforeseen issues; however more prior planning and staff meetings would have helped to eliminate many of the stresses we felt.  After projects were completed, she did not seem to spend the time to analyze how we had done, but wanted to move on to the next event or issue.  The staff was concerned that we needed to spend more time on routine operations before we took on events at the park.  We felt overwhelmed at times with the challenges of the daily workload and the calendar of special events.

**MEMORANDUM DECISION AND ORDER - 16**

- Work assignments to staff were often done more by crisis management rather than being planned in advance. Ms. Stephens seemed at times to me to be overwhelmed by the management responsibilities of the Park.

- The result of her management style created many problems and unnecessary stresses for the three-person Ranger staff and seasonal help. She did not seem to prioritize projects, develop systems or manage staff time effectively.

- After Ms. Stephens was placed on administrative leave in September 2009, Rangers Don and Kim West and I met with Mr. White to discuss how we would manage Park activities in her absence. We were not told the specifics of her absence and we did not know that the Department had concerns about her management of the park. However, we all discussed with Mr. White our frustrations with her administrative and organizational skills and the stresses and inefficiencies this caused for staff.

- There are always unforeseen last minute problems that can come up at any Park. However, the problem we experienced when Ms. Stephens was the Park Manager were generally the result of her inability to effectively plan or proactively manage potential unforeseen problems and follow through with the details of the project. These unnecessary problems frustrated staff and we attempted to talk with her on occasion about the lack of planning and our desire to complete core responsibilities of the park rather than taking on more new responsibilities. She did not seem to accept responsibility for mistakes and frequently blamed others in the Department for her failures. While Ms. Stephens had many good qualities, I do not believe she possessed the skills necessary to be an effective Park Manager.

*See* Gross Aff. at ¶¶ 5, 6, 11, & 17 (Docket No. 32, Att. 12).[5]  Indeed, only after Plaintiff was

placed on administrative leave did Defendant claim to become aware of the true "extent of the

disorganization and its deleterious effects on the management of the Park" when IDPR staff

"went through piles of papers on her desk and found invoices that were months old that had not

---

[5]  Although critical of Plaintiff's organizational skills, Mr. Gross (and two other Park Rangers) submitted a letter to Sangrey, explaining that Plaintiff "possessed some good qualities that were valuable to the Department" and urging that, if possible, she be retained in some capacity.  *See* Gross Aff. at ¶ 18 (Docket No. 32, Att. 12); *see also* Ex. 40 to White Aff. at ¶ 68 (Docket No. 32, Att. 10).

**MEMORANDUM DECISION AND ORDER - 17**

been paid, travel vouchers that had not been processed, checks that had not been deposited, and

P-card transmittals that were over the deadlines for processing."  *See* Def.'s Mem. in Supp. of

Mot. for Summ. J., p. 7 (Docket No. 32, Att. 2) (citing White Aff. at ¶¶ 88-92 (Docket No. 32,

Att. 8)); *see also* Gross Aff. at ¶¶ 12-14 (Docket No. 32, Att. 12).

### iv.   Alleged Inability to Adequately Communicate with IDPR Management and Fiscal Staff

Defendant also contends that Plaintiff frequently failed to timely respond (if at all) to

correspondence from Department personnel.  *See* Def.'s Mem. in Supp. of Mot. for Summ. J., p.

7 (Docket No. 32, Att. 2) (citing White Aff. at ¶¶ 36, 41, 42, 50, 53, 58, 70, 89 (Docket No. 32,

Att. 8); Gross Aff. at ¶ 5 (Docket No. 32, Att. 12)).  Such communication issues were first

identified to Plaintiff in her 2005 performance evaluation after her first full year as Park

Manager.  *See* Ex. 3 to White Aff. at ¶ 10 (Docket No. 32, Att. 9).  Despite occasional

improvements, these issues continued up until Plaintiff was let go in 2008.  *See* Ex. 23 to White

Aff. at ¶ 63 (Docket No. 32, Att. 10); *see also* Ex. 29 to White Aff. at ¶ 70 (Docket No. 32, Att.

10).

### v.   Alleged Failure to Successfully Discharge Core Responsibilities of the Park Manager Position

As Park Manager, Plaintiff was responsible for managing the Park's "complex financial

operation" by, among other things, "administering agency policies and procedures" and

"developing and monitoring budgets."  *See* Def.'s Mem. in Supp. of Mot. for Summ. J., p. 9

(Docket No. 32, Att. 2).  According to Defendant, Plaintiff's ineffectiveness at so managing the

fiscal side of Park operations – attributable, presumably, to Plaintiff's alleged inability to follow

IDPR's fiscal/revenue directives, lack of organization, and difficulty communicating with fiscal

**MEMORANDUM DECISION AND ORDER - 18**

staff (*see supra* at pp. 9-18) – led to insufficient funds for certain park budgets in both 2007 and 2008.  *See id.* at p. 8 (citing White Aff. at ¶¶ 55-57 & 100 (Docket No. 32, Att. 8)).

Plaintiff disagrees with Defendant's critical account of her professional aptitude as a Park Manager.  *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., pp. 4-9 (Docket No. 36).  Her subjective disagreement alone, however, cannot completely discount the legitimate, non-discriminatory reasons that Defendant contends led to Plaintiff's termination.  Instead, the burden shifts to Plaintiff to produce evidence that Defendant's reasons were pretextual.  *See Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005) (to survive summary judgment, plaintiff "must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination.").

c.       *Plaintiff's Burden: Reasons for Dismissal are Pretextual*

Once legitimate reasons for discharge are set forth, any presumption of unlawful discrimination "simply drops out of the picture" and Plaintiff "bears the ultimate burden of persuading the [C]ourt that the stated reason[s] for the discharge w[ere] false and the true reason for the discharge was unlawful sex discrimination."  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  "To avoid summary judgment, Plaintiff 'must do more than establish a prima facie case and deny the credibility of the [Defendant's] witnesses.'"  *Id.* (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994)).  "She must produce 'specific, substantial evidence of pretext.'"  *Id.*

Here, Plaintiff has not offered any evidence of pretext.  She has not mentioned the word "pretext" in her briefing.  Instead, Plaintiff argues that, in fact, she followed Department fiscal

**MEMORANDUM DECISION AND ORDER - 19**

and revenue policies (*see* Pl.'s Resp. to Def.'s Mot. for Summ. J., pp. 4-6 (Docket No. 36));[6] she

followed directives and properly managed overtime (*see id.* at pp. 6-7); [7] there was no lack of

organization in her management style (*see id.* at pp. 7-8);[8] she adequately communicated with

IDPR management and fiscal staff (*see id.* at p. 8);[9] and she successfully discharged the core

responsibilities of her position (*see id.* at pp. 8-9).[10]

But this is not enough. *See Bradley*, 104 F.3d at 270 ("However, an employee's

subjective personal judgments of her competence alone do not raise a genuine issue of material

---

[6] Plaintiff does not outright dispute Defendant's specific criticisms in this particular respect, but argues that she was "short-staffed," had to use the "antiquated and ineffective communications architecture available to her," and "the incompetence of IDPR's Fiscal Department" contributed to the loss or misplacement of documents. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., pp. 5-6 (Docket No. 36).

[7] Plaintiff argues generally that "the shortage of manpower at Dworshak State Park called for the use of overtime which was at times questioned and misunderstood by David White." *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 6 (Docket No. 36). More specifically, Plaintiff claims that increases in the use of overtime in July of 2008 were attributable to large fluctuations in water levels in the reservoir, having to travel to the North Regional Office at Supervisor White's direction, and needing to attend the funeral of a volunteer employee. *See id.* at pp. 6-7.

[8] Plaintiff states matter-of-factly that "it was her organizational acumen that allowed her to successfully work with the disorganized and dysfunctional IDPR fiscal section" and that she "nevertheless complied with IDPR's management program and organized her office accordingly." *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 7 (Docket No. 36).

[9] Plaintiff admits that "communication was lacking" between her and Supervisor White. Pl.'s Resp. to Def.'s Mot. for Summ. J., pp. 8 (Docket No. 36). Still, she claims that she was able to adequately communicate with IDPR despite Dworshak park having "a myriad of problems with the communication systems" and "IDPR Fiscal Department's own problems." *See id.*

[10] Plaintiff maintains that the basis for Defendant's claim in this respect is premised upon materials created while she was on administrative or approved leave. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 9 (Docket No. 36). Even so, Plaintiff attempts to show through her own staff "survey analysis" that she actually out-performed some of her peers in 2004-2006, and all of her peers in 2007. *See id.* (citing Ex. I to Stephens Aff. at ¶¶ 83 & 85 (Docket No. 36, Att. 19).

**MEMORANDUM DECISION AND ORDER - 20**

fact.") (citing *Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986)).

Aside from disputing Defendant's reasons for terminating her, Plaintiff has failed to introduce

any persuasive, material, evidence[11] from which a reasonable jury could conclude that Defendant

undertook the challenged employment action *due to her gender.*  Plaintiff felt that she was

wrongly treated by Supervisor White and/or that Supervisor White's attitude, generally, affected

how he dealt with her.  But her legal claim of discrimination requires more.  Otherwise, *any*

adverse employment action would necessarily amount to pretext.  Perhaps if no individuals,

beyond Supervisor White, contributed evidence of Plaintiff's deficiencies, combined with a

series of suspicious actions, the inference that might otherwise be drawn could be enough to

defeat summary judgment.  But that is not the case here.

Thus, because Plaintiff has not produced any evidence showing Defendant's proffered

reasons were pretexts for an improper discriminatory motive, Defendant's summary judgment in

---

[11]  Plaintiff, herself, prepared a "survey analysis" in an attempt to prove disparate treatment.  *See* Ex. I to Stephens Aff. at ¶¶ 83 & 85 (Docket No. 36, Att. 19).  However, as Defendant points out, the information within the referenced surveys was solicited by Supervisor White from subordinate employees regarding their Park Managers in the North Region.  *See* Def.'s Reply in Supp. of Mot. for Summ. J., p. 6 (Docket No. 37).  Therefore, regardless of the manner in which Supervisor White interpreted these results for the purpose of conducting Plaintiff's yearly evaluations, the survey information cannot speak to those administrative matters unique to a Park Manager and not known to the surveyed employees – namely, Plaintiff's ability to adhere to Department fiscal policies.

Moreover, during oral argument, and framed in the context of *Bradley*, the undersigned asked Plaintiff's counsel what specific, substantial evidence of pretext – independent of any subjective belief of competent job performance – existed in this case.  Plaintiff's counsel responded that Plaintiff was never properly mentored.  In the Court's mind, this is insufficient when recognizing that mentoring is not needed (or, at least, should not be needed) before understanding that checks must be timely processed pursuant to internal protocols – particularly when overseeing resource management, including fiscal responsibilities, at Dworshak State Park.

**MEMORANDUM DECISION AND ORDER - 21**

this respect is granted.[12]  *See Bradley*, 104 F.3d at 271 (affirming district court's summary judgment on sex discrimination claim when confronted only with evidence of plaintiff's subjective accounts of job performance).  Plaintiff's gender discrimination claim is dismissed.

2.      Plaintiff's Hostile Work Environment Claim

To survive summary judgment on her hostile work environment claim, Plaintiff must raise genuine issues of material fact that (1) she was subjected to verbal or physical harassment due to her gender, (2) the harassment was unwelcome, and (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.  *Collier v. Turner Indus. Group, L.L.C.*, 2011 WL 2517020, *10 (D. Idaho 2011) (citing *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000)).  Plaintiff must show that the conduct at issue was both objectively and subjectively offensive: she must show that a reasonable person would find the work environment to be "hostile or abusive," and that she in fact did perceive it to be so.  *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  The Ninth Circuit has held that, although conduct involving sexually-explicit words or acts is one way to prove hostile work environment, it is not the only way.  The ultimate issue is whether an employee is subjected to hostile conduct based on gender.  *Id.* at *11 (citing *EEOC v. National Educ. Ass'n, Alaska*, 422 F.3d 840, 844-45 (9th Cir. 2005)).  Thus, the lack of any particularly sexually-explicit behavior is not fatal to a hostile work environment claim, even though such behavior can certainly be evidence of such a hostile work environment.

---

[12]  In reaching this decision, the Court makes no determination on either (1) the preclusive effect, if any, of the Idaho Personnel Commission's June 17, 2009 Order (*see* Ex. 2 to Benjamin Aff. at ¶ 2 (Docket No. 32, Att. 4)), or (2) Defendant's "same actor" defense (*see* Def.'s Mem. in Supp. of Mot. for Summ. J., pp. 10-11 (Docket No. 32, Att. 2)).

**MEMORANDUM DECISION AND ORDER - 22**

Plaintiff's hostile work environment claim consists of two distinct forms: (1) that IDPR's overall organizational structure is oppressive to women and creates a de facto hostile work environment (*see* Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 11 (Docket No. 36)); and, (2) that Plaintiff was individually subjected to abuse due to her gender. *See id.* at p. 12. Based upon the existing record, the Court disagrees.

To state that IDPR itself fosters a hostile work environment by virtue of an alleged "male dominated culture that has traditionally made it difficult for women to advance in position and responsibility" (*see id.* at p. 11) overlooks several important realities. First, and most obviously, Plaintiff herself was promoted from Park Ranger to Park Manager in 2004. Moreover, the Court takes judicial notice that, from 1987 to 2001, Yvonne Ferrell was IDPR's fifth Director, after having served as Deputy Director in the Washington State Parks and Recreation division – at the time she was hired, Ms. Ferrell was the only female Director in the nation. Eight years and three Directors later, Nancy Merrill became the Director in 2009 and is currently IDPR's Director as acknowledged by Plaintiff's counsel during oral argument. These facts should not be interpreted as forever foreclosing a hostile work environment claim against IDPR; however, when such a claim is premised upon an alleged culture that discourages the placement and advancement of women in positions of responsibility, these facts understandably reveal the opposite to be true. In this respect, then, Plaintiff's claim is without merit.

As to Plaintiff's more individualized claims of verbal abuse, Plaintiff appears to argue that Supervisor White's criticisms of her work performance created an actionable hostile work environment. *See* Compl. at ¶¶ 30, 32 (Docket No. 1). In particular, Plaintiff cites the following as evidence of "unwanted verbal abuse because of her gender":

**MEMORANDUM DECISION AND ORDER - 23**

- That on many occasions, I informed Mr. David White that both the Pre-STARS and the STARS communications architecture was woefully inadequate at Dworshak.  *See* Stephens Aff. at ¶ 26 (Docket No. 36, Att. 10).

- That I brought the problem of the Pre-STARS and the STARS systems problems directly to my supervisor, and management Information Systems personnel.  *See id*. at ¶ 27.

- That rather than take my advice, David White chastised me and asked in words to the effect of: "Why are you not finding a way to accomplish the assignment rather than making excuses?"  *See id*. at ¶ 28.

- That when I did go to Mr. White with the problems of Pre-STARS and the STARS systems, David White would on more than one occasion say the following or words to the effect that: "It doesn't matter what the technical problems were, it was my job to just deal with it and fix the problem."  *See id*. at ¶ 29.

- That by chastising me rather than working on the problem, I felt that David White did not want me to be successful in my efforts to run the park efficiently, rather he wanted to make sure the process was as difficult as possible.  I felt that asking for adequate equipment to complete my duties was not an "excuse."  *See id*. at ¶ 30.

- That even though I told David White how difficult it was to function in an environment where the computer systems barely functioned, he refused to spend the time at the park to understand the challenges, or even listen to me when I advised him of the issues with the fiscal department of IDPR and the obsolete communications equipment which I was forced to use at Dworshak State Park.  *See id*. at ¶ 32.

- That when I approached David White and asked for assistance in finding a solution to the problems concerning administrative aid and the communications difficulties, David White simply told me in words to the effect of "You are just making excuses" or  "The previous managers managed without additional help."  *See id*. at ¶ 34.

*See* Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 12 (Docket No. 36).  Simply put, these exchanges, while no-doubt biting and unpleasant to Plaintiff, do not rise to the level of the severe or pervasive conduct needed to support a hostile work environment claim.  Further, nothing in these

**MEMORANDUM DECISION AND ORDER - 24**

examples suggests that Supervisor White's apparent frustration with Plaintiff was directed at Plaintiff *because* of her gender, rather than some other work-related reason.  To this end, the record reflects that Plaintiff was not always the recipient of Supervisor White's allegedly captious eye – she received overall favorable performance evaluations at the beginning of her term as Park Manager, and other, male employees, were the subject of Supervisor White's "birddogging" when it came to IDPR fiscal matters.  *See, e.g.*, Exs. 2, 3, & 11 of White Aff. at ¶¶ 5, 10, & 41 (Docket No. 32, Atts. 9 & 10).  This is not to say that Supervisor White's management style was ideal; still, whatever shortcomings he may have had in this regard do not morph into a hostile work environment once an aggrieved employee is terminated from her job.[13] Accordingly, Plaintiff's hostile work environment claim is dismissed.

### 3.  Plaintiff's Negligent Infliction of Emotional Distress Claim

In addition to her gender discrimination and hostile work environment claims, Plaintiff brings a negligent infliction of emotional distress claim – a state tort claim.  Of relevance to this claim, although Plaintiff filed a complaint with the Idaho Human Rights Commission, she did not file a separate notice of her tort claim in accordance with the Idaho Tort Claims Act.  As a result, Defendant now seeks to dismiss Plaintiff's negligent infliction of emotional distress claim.  *See* Def.'s Mem. in Supp. of Mot. for Summ. J., pp. 18-19 (Docket No. 32, Att. 2).

The Idaho Tort Claims Act generally permits claims against governmental entities "for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees . . . ."  I.C. § 6-903.  Before proceeding with such an action, however, the Idaho

---

[13]  In reaching this decision, the Court makes no determination on the applicability of the *Faragher/Ellerth* affirmative defense to these facts.  *See* Def.'s Mem. in Supp. of Mot. for Summ. J., pp. 14-18 (Docket No. 32, Att. 2).

**MEMORANDUM DECISION AND ORDER - 25**

Tort Claims Act requires that "[a]ll claims against a political subdivision arising under the provisions of this act and all claims against an employee of a political subdivision . . . shall be presented to and filed with the clerk or secretary of the political subdivision." I.C. § 6-906.

The Idaho Human Rights Act prohibits certain acts of discrimination. *See* I.C. §§ 67-5909 & 5911. The Idaho Human Rights Act provides that "[a]ny person who believes he or she has been subject to unlawful discrimination . . . may file a complaint" with the Idaho Human Rights Commission." I.C. § 67-5907. IHRA's section 67-5908(2) states that a "complaint must be filed with the commission as a condition precedent to litigation." I.C. § 67-5908(2).

Plaintiff argues that her complaint with the Idaho Human Rights Commission under the Idaho Human Rights Act satisfies any separate requirement that she *also* file a notice of her tort claims under the Idaho Tort Claims Act. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 16 (Docket No. 36) ("Once a Plaintiff files a complaint with the Idaho Human Rights Commission, the complaint satisfies the notice requirements of the [Idaho Tort Claims Act], and any allegation contained in the complaint filed with the Idaho Human Rights Commission does not require a separate tort claim under the [Idaho Tort Claims Act]."). The undersigned disagrees.

Regardless of whatever "economy" of action, sensible or not, that might result from a ruling in Plaintiff's favor on this discrete issue, such a ruling necessarily would run against the grain of the law of sovereign immunity. In the absence of a legislatively-enacted waiver of such immunity, Plaintiff would have no claim of this nature to pursue at all. The waiver of such immunity is to be considered, and interpreted, in a manner consistent with the legislature's decision as to which, when, and how such claims may be brought against the State. Such issues were at play in *Johnson v. North Idaho Coll.*, 2007 WL 917379 (D. Idaho 2007), in which U.S.

**MEMORANDUM DECISION AND ORDER - 26**

District Judge Edward J. Lodge addressed whether a complaint filed with the Idaho Human Rights Commission satisfies the notice requirement of the Idaho Tort Claims Act for state tort claims. *Id*. at *2. Answering "no" to this question, Judge Lodge relied upon the Idaho Supreme Court's repeated emphasis "that compliance with the notice requirement . . . is a mandatory condition precedent to bringing an action under the [Idaho] Tort Claims Act," reasoning:

> By statute, the Idaho Human Rights Act is limited to matters that concern "discrimination because of race, color, religion, sex, or national origin . . . [and] age." Accordingly, a provision of the Act states that the filing of a complaint with the Idaho Human Rights Commission only "satisfies the notice requirements of the [Idaho Tort Claims Act] as to the allegations of the administrative complaint arising under [the Idaho Human Rights Act]." *This language, then, expressly limits Plaintiff's compliance with the Idaho Tort Claims Act, by the filing of her complaint with the Idaho Human Rights Commission, to the claims that allege discrimination and sexual harassment. These claims – discrimination and sexual harassment – are the only ones asserted by Plaintiff that arise under the Idaho Human Rights Act. The filing of a complaint with the Idaho Human Rights Commission cannot serve as a substitute for filing a notice as to Plaintiff's state law tort claims because § 5907A of the Idaho Human rights Act does not permit it.*

*Id*. (emphasis added) (internal citations omitted). Though *Johnson* is not be a reported decision, and the Ninth Circuit's subsequent affirmance (*see Johnson v. North Idaho Coll.*, 2009 WL 3303714 (9th Cir. 2009)) is unpublished, this Court sees no reason to depart from the rationale contained in either decision.[14] Therefore, Plaintiff's negligent infliction of emotional distress is

---

[14] As to Plaintiff's arguments concerning the procedural difficulties that may confront a litigant trying to satisfy the requirements of both the Idaho Tort Claims Act and the Idaho Human Rights Act, along with filing actions in federal court, the undersigned again turns to Judge Lodge. *See Johnson*, 2007 WL 917379 at * 2 (citing *City of Philadelphia v. Lead Indus. Ass'n*, 994 F.2d 112, 123 (3d Cir. 1993) (explaining that "[i]n a diversity case . . . federal courts may not engage in judicial activism. Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law. Our role is to apply the current law of the jurisdiction, and leave it undisturbed . . . . Absent some authoritative signal from the legislature or the state courts, [there is] no basis for even considering the pros and cons of innovative theories. We must apply the law of the forum as we infer it presently to be, not as it might come to be.").

**MEMORANDUM DECISION AND ORDER - 27**

separately barred by the Idaho Tort Claims Act.[15]

## IV.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED THAT:

1.      Plaintiff's Motion to Amend Complaint (Docket No. 29) is DENIED; and

2.      Defendant's Motion for Summary Judgment (Docket No. 32) is GRANTED.



DATED:  **December 12, 2011**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

---

[15]   In reaching this decision, the Court makes no determination on whether Plaintiff has sufficiently pled the elements of a negligent infliction of emotional distress claim under Idaho law – namely, whether she has adequately alleged a physical manifestation of an injury caused by the alleged negligent infliction of emotional distress.  *See* Def.'s Mem. in Supp. of Mot. for Summ. J., pp. 19-20 (Docket No. 32, Att. 2).

**MEMORANDUM DECISION AND ORDER - 28**